Steven C. Dawson, Bar No. 006674
Anita Rosenthal, Bar No. 006199
Sander R. Dawson, Bar No. 032243
DAWSON & ROSENTHAL, P.C.
25 Schnebly Hill Road
Sedona, Arizona 86336-4233
Telephone: (928) 282-3111
dandr@dawsonandrosenthal.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Alexis Gabrielle Dinsbach, an individual,<br><br>　　　Plaintiff,<br><br>vs.<br><br>Candice Harris, an individual; Maricopa County, Arizona, a body politic; Sheriff Paul Penzone, in his official and individual capacity; John and Jane Does I-X,<br><br>　　　Defendants. | CASE NO:<br><br>**COMPLAINT FOR DAMAGES**<br><br>(Tort – Non-Motor Vehicle)<br><br>(Jury Trial Requested) |

Plaintiff Alexis Dinsbach alleges as follows:

*I.  INTRODUCTION*

1. This is an action arising from a brutal and unprovoked assault on Alexis Gabrielle Dinsbach ("the Assault"), a 26-year-old mentally incompetent pre-trial detainee in Estrella Women's Jail. After being harassed by her bunkmate after lights-out, Ms. Dinsbach was severely beaten by Candice Harris, the MCSO deputy on duty who noticed the disturbance. Defendant Harris repeatedly punched a defenseless and much smaller Dinsbach in the face and head as Dinsbach crawled back in her bunk and attempted to cover her face from the onslaught. Harris then walked around to the other side of Dinsbach's bunk, where she dragged Dinsbach to the ground and repeatedly punched and stomped Dinsbach's face and head, breaking her jaw.

## II. JURISDICTION AND VENUE

2. Dinsbach brings this action for money damages, declaratory, and injunctive relief for injuries she suffered at Estrella Women's Jail in violation of her rights under Arizona law, the laws of the United States, and the U. S. Constitution, including 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments of the United States Constitution.

3. This court has jurisdiction over Dinsbach's state and federal claims pursuant to Article 6 Section 14 of the Arizona Constitution.

4. Venue is proper in this Court pursuant to A.R.S. § 12-401 as the parties are residents of Maricopa County and employees of Maricopa County, Maricopa County is a defendant, and all of the events that gave rise to this action occurred in Maricopa County.

5. Plaintiff satisfied the provisions of AR.S. § 12-821.01 by serving a Notice of Claim more than 60 days prior to filing this Complaint, and no defendant has responded.

6. Plaintiff exhausted her administrative remedies by filing an Inmate Grievance Form with the Maricopa County Sheriff's Office ("MCSO") on August 2, 2017. MCSO responded that it was investigating the Assault by Office Harris and that Dinsbach "will not be notified of the outcome."

7. Upon information and belief, the administrative investigation into the Assault by Harris, complained of in Dinsbach's Inmate Grievance Form, resulted in Ms. Harris being terminated from MCSO in February 2018. Dinsbach was not notified of the status or outcome of the investigation and has not otherwise received a substantive response to her Inmate Grievance Form, which remains unresolved. The statute of limitations and deadline for serving a notice of claim have therefore been tolled pending the resolution of its inmate grievance form.

8. The statute of limitations and deadline for serving a notice of claim have also been tolled because Plaintiff suffers from a mental illness that renders her mentally incompetent. Plaintiff suffers, and since before the Assault has suffered, a serious mental illness that renders her incapable of managing her affairs, and thus from understanding her legal rights and acting upon them. Dinsbach was declared incompetent to stand trial in her criminal case (CR-

2017117838) on July 13, 2017 and was in the County's Restoration to Competence (RTC) program when the Assault occurred on July 26, 2017.

9. Although the Arizona Superior Court found Dinsbach competent to stand trial on January 22, 2018, Ms. Dinsbach remains incapable of managing her affairs and understanding and acting upon her legal rights to this day. Competence to stand trial, in the criminal context, means understanding the charges brought against the criminal defendant and ability to assist in the defense against those charges. The court's finding of competence to stand trial does not constitute "competence" as used under ARS 12-821.01(D).

10. The RTC program teaches inmates about the process, procedures, and rights involved in a criminal prosecution. The RTC program that Plaintiff underwent did not involve treatment for Plaintiff's underlying condition by a qualified mental health professional and Plaintiff's mental status is still in question.

11. This is apparent from Ms. Dinsbach's Inmate Grievance Form of August 2017, in which she reported that a male officer was "drowning girls" in Estrella Jail and adds, almost as an apparent afterthought, that she was assaulted by Officer Harris—the reason she was given an inmate grievance form.

12. Further reflecting that Plaintiff cannot manage her own affairs and does not understand or appreciate her legal rights, Plaintiff never mentioned the assault to her Public Defender, and when her Public Defender learned of the incident and asked Plaintiff about it, it was clear to him that Plaintiff did not understand or appreciate the nature of the wrong.

13. Upon information and belief, a medical evaluation by a mental health professional will confirm that Dinsbach remains incapable of managing her affairs or understanding and acting upon her legal rights.

14. The statute of limitations and deadline for serving a notice of claim have therefore been tolled and will not begin to run until Dinsbach is competent, which she currently is not.

## III.  THE PARTIES

15. Plaintiff Alexis Dinsbach incorporates the allegations in each of the preceding

paragraphs as if fully set forth herein.

16. Dinsbach is and at all times relevant hereto was a resident of Phoenix, Arizona, a citizen of the United States of America, and in the custody of MCSO and Defendants.

17. On July 26, 2017, Dinsbach was a pre-trial detainee housed in Estrella Women's Jail in Maricopa County. As a pre-trial detainee, Dinsbach was arrested and detained pending trial but had not, and has not, been convicted of any crime and was presumed innocent under the Constitutions of the State of Arizona and the United States.

18. Defendant Maricopa County ("The County) is a public entity formed and designated as such pursuant to Title 11 of the Arizona Revised Statutes. The County has supervisory and oversight responsibility for the operation of its jails by the elected Sheriff and, also, as permitted by state and federal law, may be independently and/or vicariously liable for the wrongful conduct of its officers, agents, and employees, including the officers, agents and employees of its divisions and those working in the MCSO. It is also liable for the unconstitutional policies of MCSO and Defendant Paul Penzone, the County's final policymaker, as they are also the official policies of the County.

19. Defendant Paul Penzone was (and is currently) the elected Sheriff of Maricopa County. As Sheriff of Maricopa County, Defendant Penzone is an officer, agent, and employee of the County. Defendant Penzone acted under color of law as the person in charge of the MCSO. He is the County's final policy maker as to its jail system and, therefore, the County is liable under 42 U.S.C. § 1983 for Defendant Penzone's unconstitutional policies, procedures, and/or customs. Defendant Penzone is named in both his official capacity, for purposes of Dinsbach's state law vicarious liability and federal municipal liability claims, and in his individual capacity for purpose of Dinsbach's claims against Defendant Penzone individually under 42 U.S.C. § 1983.

20. On July 26, 2017, and for some time prior to this date, Defendant MCSO Officer Candice Harris was an employee and agent of Maricopa County working in the MCSO as a Detention Officer at Estrella Jail, a citizen of the United States, and a resident of Arizona. Defendant Harris is sued in her individual and official capacities for purposes of Dinsbach's

claims under 42 U.S.C. § 1983. At all times relevant, Defendant Harris was acting within the course and scope of her employment as an employee of Maricopa County and under color of law.

21. The true names of Defendants John and Jane Does I-X are unknown at this time. As such, they are named fictitiously and Plaintiff will seek leave to amend when their true names, capacities, and involvement in the subject incident are ascertained.

22. MCSO is a non-jural entity and a law enforcement agency of Maricopa County, responsible for operating the County's jails, including Estrella Jail. MCSO was Defendant Harris's employer during the incident giving rise to these allegations.

23. Defendant Maricopa County is a political subdivision of the State of Arizona responsible for funding and oversight of MCSO. The County has failed to ensure that MCSO's programs and/or activities comply with the U.S. Constitution and federal law.

## IV.   BACKGROUND ALLEGATIONS COMMON TO ALL COUNTS

24. Plaintiff Alexis Dinsbach incorporates the allegations in each of the preceding paragraphs as if fully set forth herein.

25. All conduct alleged herein against Defendant Harris was performed in the course and scope of her agency and/or employment relationship with MCSO and Defendant the County, rendering Defendants vicariously liable for Harris's actions under the doctrine of *respondeat superior*.

26. All conduct alleged herein against Defendant Penzone was performed in the course and scope of his agency and/or employment relationship with MCSO and Defendant Maricopa County, rendering Defendants vicariously liable for Penzone's actions under the doctrine of *respondeat superior*.

27. In addition to being vicariously liable for Defendant Harris' conduct and the resulting injuries to Plaintiff described in this Complaint, Defendants Maricopa County and Penzone (collectively referred to herein as the "MCSO Defendants") are directly liable under Arizona law and 42 U.S.C. § 1983 for the negligent hiring, training, and/or supervision of Defendant

Harris and for creating, cultivating, implementing, and/or condoning an official custom, practice, policy, and/or culture that reflect a deliberate indifference to and were contributing causes behind the constitutional violations and resulting injuries alleged herein.

28. Defendant Maricopa County is properly named under 42 U.S.C. § 1983 for the final decisions of Defendant Penzone in his official capacity as the Sheriff of Maricopa County and MCSO, and for those of any final decision makers, with respect to the deliberately indifferent policies, decisions, widespread habits, customs, usages, and/or practices that caused or contributed to the constitutional violations and resulting injuries alleged herein.

29. Plaintiff Dinsbach alleges that Defendant Harris made an unreasonable seizure of her person, using unreasonable force to restrain her and take her to the ground, and continuing to apply unreasonable force after she was controlled and incapacitated, causing serious injuries to Plaintiff. These constitutional violations were committed as a result of the policies and customs of the MCSO Defendants, and the negligent hiring, training, and supervision of its employees and officers involved in the incident described herein, including but not limited to Defendant Harris. The MCSO Defendants are liable for negligent hiring, training, and supervision, and under the theory of *respondeat superior* for the torts committed by their employees and officers, including but not limited to Defendant Harris.

30. This action arises under the laws of the State of Arizona, the laws of the United States, and the United States Constitution, including Article III, Section 1, and is brought pursuant to 42 U.S.C. §§ 1981, 1983 and 1988.

1. **UNDERLYING FACTS**

31. The Arizona Superior Court found Plaintiff incompetent to stand trial in her criminal case on July 13, 2017. Plaintiff was placed in restoration. At the time of the attack by Defendant Harris, Ms. Dinsbach was in restoration.

32. On July 26, 2017, after lights-out, Defendant Harris noticed a disturbance in Dinsbach's unit where other inmates were sleeping. Harris left her observation post and entered the dormitory, immediately approaching Dinsbach's bunk.

33. The disturbance was caused by another unknown inmate harassing and touching Ms.

Dinsbach, who was trying to sleep, and Dinsbach's protests in response.

34. Video surveillance footage shows that when Officer Harris entered the dormitory, Dinsbach was laying down in her bunk.

35. Without ascertaining the facts, determining what happened or who was at fault for the disturbance, and without saying a word to Dinsbach, Defendant Harris immediately bent down into Dinsbach's bunk, grabbed Dinsbach's hand or wrist, and threw it back to cause Dinsbach to lie down flat on her back.

36. At that point, Dinsbach can be seen putting her hands up conveying to Harris, "I didn't do anything."

37. Harris forcibly pulled Dinsbach up by her right arm or wrist from a prone position to an upright position.

38. Harris then shoved Dinsbach back and began repeatedly punching Dinsbach in the face with both her right and left fists.

39. In an effort to protect herself from the onslaught, Dinsbach guarded her face with her arms and tried to create distance between herself and Harris using her legs.

40. The video, which was captured from several different angles, clearly shows Officer Harris seeking a better angle to continue hitting Dinsbach in the face by dragging Dinsbach from her bunk and onto the floor.

41. Dinsbach put her hands out to protect herself, trying to block Harris' punches and/or create distance between herself and Harris.

42. After Harris dragged Dinsbach out of her bunk, she began punching Dinsbach in the head and face again.

43. After several punches to the head and face, Harris began stomping on Dinsbach's head and face while she was on the ground.

44. The footage shows Officer Harris grabbing hold of the top bunk and brutally kicking and stomping Dinsbach's head and face, breaking her jaw.

45. Dinsbach was incapacitated, lying in a submissive or fetal position on the ground.

46. Officer Harris then punched a motionless Dinsbach in the head or face one more time

before another inmate is seen on the video trying to intervene.

47. Dinsbach tried to sit up, at which point Harris threw her back on the ground and placed Dinsbach in handcuffs.

48. Harris then began dragging Dinsbach, who was unable to walk, legs dragging behind her.

49. Harris dropped Dinsbach to the ground as two other MCSO officers approached.

50. The viciousness of the attack is not only apparent from the videos, but is evident in the looks of horror on the faces of other inmates and in Dinsbach's resulting injuries.

51. Dinsbach did not strike, grab, or otherwise harm Officer Harris during the assault, nor did she attempt to do so. Any contact Dinsbach made with Harris was unintended and incidental to Dinsbach's attempt to protect herself.

52. This is clear from the pictures of Officer Harris after the incident, which show that Officer Harris suffered no injuries from the altercation other than minimal scrapes and cuts which Dinsbach did not cause and/or did not intend to cause—i.e., "defensive wounds." (see photos attached as Exs. 1 and 2).

53. MCSO submitted the case to the County Attorney's Office for criminal prosecution of aggravated assault. After reviewing video footage of the assault, MSCO provided a probable cause statement (Ex. 3), which provides:

> Officer Harris is seen pulling inmate Dinsbach off the bunk onto the ground while still punching her in the face. While inmate is on the ground and in a fetal position Officer Harris stomps on her head approximately 7 times. Inmate Dinsbach was transported and treated for her injuries. Inmate Dinsbach left eye was bruised and swollen shut, had a cut under right eye and a fractured jaw (mandibular neck).

54. Officer Harris's attack was unprovoked, unnecessary, and without justification.

55. Dinsbach committed no wrongdoing and did not resist Harris or otherwise act in a way as to cause Officer Harris alarm, concern, or fear for her safety or the safety of others.

56. On the contrary, as a mentally ill inmate in general population being harassed by her bunkmate, Dinsbach was in need of help when Officer Harris appeared. Harris failed to assist Dinsbach and, instead, savagely beat her.

57. As a direct and proximate result of Harris's actions, Dinsbach sustained significant and

serious injuries to her face and body, including a "nondisplaced right oblique condylar neck fracture (slanting fracture to the mandibular neck)" and a "large hematoma to the left forehead, periorbital edema (swelling) to the left eye." (Ex. 3).

58. In addition to her broken jaw, Dinsbach's injuries included numerous contusions and cuts on her face and body (see Ex. 3).

59. Dinsbach was hospitalized for several days.

60. Dinsbach, who was already incompetent and mentally and emotionally fragile, also suffered severe mental and emotional trauma, distress, suffering, and fear.

61. She continues to suffer from these injuries today.

62. Officer Harris admitted in an interview with a detective from MCSO's Professional Standards Bureau that she "went overboard." (Ex. 3). Anyone who sees the footage of the brutal assault will agree; indeed, it is difficult to watch.

63. The appropriate level of force in this situation would have been none.

64. Because there was no need for force, the initial use of force was constitutionally unreasonable and plainly excessive.

65. A reasonable detention officer in Harris' position would have ascertained the facts and circumstances before resorting to force.

66. A reasonable detention officer, after ascertaining the facts and circumstances, would have known that Dinsbach was in need of help and did not pose a threat.

67. A reasonable detention officer, after ascertaining the facts and circumstances, would have known that no force was required against Ms. Dinsbach.

68. A reasonable detention officer would have known to ascertain the facts and use defusing techniques with a mentally ill inmate to control the situation.

69. At no time did Harris explain the reason she was there.

70. Instead, Harris immediately resorted to gratuitous force before Dinsbach had a chance to respond, question Harris's presence, or understand what was happening.

71. Dinsbach's purely defensive conduct does not constitute resistance, and certainly does not constitute active or violent resistance.

72. Officer Harris used non-trivial force without warning and then substantial force, also without warning.

73. At no time did Harris give Dinsbach a lawful order and an opportunity to comply.

74. Officer Harris repeatedly kicked and stomped Dinsbach's head and face on the ground well after Dinsbach was neutralized, lying in a submissive or fetal position – she had effectively "given up."

75. Thus, even if Dinsbach had actively resisted, the degree of force used by Harris was grossly excessive.

76. Harris intended to cause actual physical harm.

## CLAIMS FOR RELIEF

### I. FIRST CLAIM FOR RELIEF: 42 U.S.C. § 1983 – EXCESSIVE FORCE

**(Against Defendant Harris)**

77. Plaintiff hereby incorporates the above paragraphs as if fully set forth herein.

78. Plaintiff claims damages pursuant to 42 U.S.C. § 1983 for the injuries set forth above for violation of her constitutional rights under color of law.

79. Defendant Harris is a proper person to this claim for purposes of 42 U.S.C. § 1983.

80. Defendant Harris, at all relevant times hereto, was acting under color of state law in her capacity as a Deputy for Maricopa County and MCSO and her acts and omissions were conducted in the scope of her official duties of employment with Defendant Maricopa County and MCSO.

81. At the time of the complained of events, Plaintiff had a clearly established constitutional right under the Fourth and Fourteenth Amendments of the United States Constitution to be secure in her person from unreasonable seizures and from unreasonable force by law enforcement.

82. A reasonable police officer would have known of these rights at the time of the complained of conduct, as they were clearly established at that time.

83. Defendant Harris's actions and use of force were objectively unreasonable and

excessive in light of the facts and circumstances confronting her, and thus violated Plaintiff's clearly established right to be free from unreasonable seizures and unreasonable force.

84. Defendant Harris's actions and use of force, as described herein, were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights. The force used by Defendant Harris shocks the conscience and violated Plaintiff's constitutional rights.

85. Defendant Harris unlawfully seized Plaintiff by means of objectively unreasonable, excessive and conscious-shocking physical force, thereby unreasonably depriving Plaintiff of her freedom.

86. The acts or omissions of Defendant Harris, as described herein, intentionally deprived Plaintiff of her constitutional rights and caused her other damages.

87. This individual Defendant is not entitled to qualified immunity for the complained of conduct.

88. Defendant Harris executed the above described aggressive and violent acts with intent to physically and emotionally injure Plaintiff and/or with conscious disregard of the substantial and likely risk of injuring Plaintiff.

89. As a proximate result of Defendant Harris's unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling her to compensatory and special damages, in amounts to be determined at trial. As a further result of Defendant Harris's unlawful conduct, Plaintiff has incurred special damages, including medically related expenses, and may continue to incur further such damages for medical and psychological treatment.

90. Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law. There may also be special damages for lien interests.

91. In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendant Harris pursuant to A.R.S. § 12-820.04 to the extent Defendant Harris acted outside the course and scope of her employment, and under

42 U.S.C. § 1983, in that the actions of this individual Defendant were taken maliciously, willfully and/or with a conscious or wanton disregard of Plaintiff's constitutional rights.

## II. SECOND CLAIM FOR RELIEF: 42 U.S.C. § 1983 – DELIBERATELY INDIFFERENT POLICIES, PRACTICES, CUSTOMS, TRAINING, & SUPERVISION

**(Against Defendants Maricopa County & Penzone)**

92. Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

93. Plaintiff claims damages under 42 U.S.C. § 1983 for the injuries set forth above against Maricopa County and Defendant Penzone for violation of her constitutional rights under color of law.

94. At all times relevant hereto, all individual Defendants to this claim and those whose identities are not yet known, were acting under the color of state law in their capacity as detention officers for MCSO and their acts or omissions were conducted within the scope of their official duties or employment.

95. Plaintiff had the following clearly established rights at the time of the complained of conduct:

   a. the right to be secure in her person from unreasonable seizure through excessive force, under the Fourth Amendment; and

   b. the right to bodily integrity and to be free from excessive force by law enforcement under the Fourteenth Amendment.

96. Any reasonable police officer knew or should have known of this right at the time of the complained of conduct as it was clearly established at that time.

97. The acts or omissions of Defendants as described herein intentionally deprived Plaintiff of her constitutional and statutory rights and caused her other damages.

98. Defendants are not entitled to qualified immunity for the complained of conduct.

99. Defendant Penzone and Defendant Maricopa County were, at all times relevant, policymakers for the County and MCSO, and in that capacity established policies, procedures, customs, and/or practices for the same.

100. These Defendants developed, maintained, and/or retained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, which were contributing forces behind and proximately caused the violations of Plaintiff's constitutional and federal rights as set forth in this Complaint, and resulted from a conscious or deliberate choice to follow a course of action from among various available less harmful alternatives.

101. The abusive, illegal and unconstitutional policies of MCSO that span decades are well known and have been the subject of multiple claims and lawsuits based upon violations of individuals' Constitutional rights.

102. Upon information and belief, the Defendants named in this cause of action have created and tolerated an atmosphere that tolerates and/or promotes mistreatment of mentally ill inmates and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

103. Upon information and belief, the Defendants named in this cause of action have created and tolerated an atmosphere that tolerates and/or promotes unreasonable uses of force, and have developed and maintained long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices, and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

104. In light of the duties and responsibilities of those deputies that participate and supervise prisoners in custody, especially those who are mentally ill, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein, that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

105. The practice of housing mentally ill inmates with the general jail population to

be overseen by detention officers with insufficient or no training on communicating and interacting with mentally ill inmates constitutes negligence and gross and/or deliberate indifference for the rights of all mentally ill inmates.

106. As a direct result of Defendants' unlawful conduct, Plaintiff has suffered actual physical, mental, and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial.

*III. THIRD CLAIM FOR RELIEF: VICARIOUS LIABILITY FOR NEGLIGENCE & BATTERY*

**(Against Defendants Maricopa County & Penzone)**

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

108. Defendant Harris owed Plaintiff a duty to use reasonable care relative to the conduct and events alleged herein, including but not limited to exercising reasonable care in approaching Plaintiff and using force.

109. Defendant Harris breached her duty of care by negligently using unreasonable and excessive force in restraining Plaintiff as described above, thereby physically injuring Plaintiff.

110. Officer Harris knew or should have known that approaching an already agitated, mentally ill inmate would require effective defusing techniques to deescalate the situation. This is reasonable and prudent not only for the inmate's safety, but for the officer as well.

111. Defendant Harris's breach of duty caused injury to Plaintiff and damages as set forth in this Complaint and in an amount to be proven at trial.

112. Defendant Harris's conduct constitutes negligence under Arizona law.

113. Defendant Harris's conduct also constitute battery under Arizona law, as she knowingly used unreasonable and excessive force against Plaintiff.

114. Harris' intentional assault was an affront to Plaintiff's dignity as a human being, damaged her self-image, and caused physical, mental, and emotional distress.

115. Defendant Harris acted with intent to cause a harmful or offensive contact with

Plaintiff's person and/or imminent apprehension thereof when she (a) grabbed Dinsbach's arm in an attempt to forcibly relocate her to another bunk; (b) jumped on Dinsbach in her bunk and began punching her; (c) dragged Dinsbach from her bed and (d) repeatedly punched and stomped on Dinsbach's head and face.

116. Each act of violence independently supports a separate claim for assault and battery.

117. Defendant Harris engaged in the above-described conduct willfully, maliciously, in bad faith, and/our in conscious disregard of Plaintiff's safety, well-being, and federally protected constitutional rights.

118. The acts or omissions of Defendant Harris as described herein intentionally deprived Plaintiff of her constitutional and statutory rights and caused her other damages.

119. Defendant Harris at all times relevant hereto was acting pursuant to MCSO custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in her actions pertaining to Plaintiff.

120. As a direct and proximate result of Defendant Harris's conduct, Plaintiff suffered actual physical and emotional injuries and other damages and losses as described herein, entitling her to compensatory, special, and punitive damages in amounts to be determined at trial. As a further result of the Defendant's unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur such damages in amounts to be established at trial.

121. Defendant Harris knew her misconduct could harm the health and wellbeing of Plaintiff. Harris's conduct was committed intentionally and with an evil mind, which constitutes aggravated, malicious, and outrageous conduct done in conscious disregard of Plaintiff's rights, health, safety, and wellbeing.

122. Further aggravating Defendant Harris's tortious conduct, Defendant Harris was aware that given Plaintiff's age and size, and the significant disparity in size, strength, and training between herself and Plaintiff, Defendant Harris's conduct was likely to seriously injure Plaintiff.

123. Defendants the County and Penzone are vicariously liable for the acts of Harris described above, which were committed in the scope of Harris' agency and/or employment with and for Defendants the County and Penzone.

## IV. SIXTH CLAIM FOR RELIEF: NEGLIGENT HIRING, TRAINING, & SUPERVISION

**(Against Defendants Maricopa County & Sheriff Penzone)**

124. Plaintiff incorporates by reference all other paragraphs of this Complaint as though fully set forth herein.

125. Defendants owed Plaintiff a duty to use reasonable care relative to the conduct and events alleged herein, including but not limited to a duty to exercise reasonable care in the hiring, training, and supervision of MCSO deputies, including Defendant Harris.

126. Upon information and belief, Defendants breached their respective duties of care to Plaintiff and put Plaintiff and other inmates in Defendants' custody at risk by negligently hiring Officer Harris without conducting a reasonable investigation into her background, history, and suitability for the position of detention officer.

127. Defendants breached their respective duties of care by negligently training and supervising deputies within the MCSO, including but not limited to Defendant Harris.

128. Said failures independently contributed to and caused Plaintiff's injuries as described above by depriving Defendant Harris of the necessary training and supervision needed to lawfully and effectively carry out her duties as a Sheriff's Deputy.

129. But for the failure of Defendants MCSO and Penzone to adequately train and supervise Defendant Harris, Harris would not have resorted to the dangerous and aggressive tactics she used on Plaintiff. Because Defendants MCSO and Penzone failed to exercise reasonable care in training and supervising Defendant Harris, Harris was not equipped to: (a) utilize non-violent means to control the situation before resorting to force, as she immediately did with Plaintiff; (b) accurately assess the situation to determine whether and to what extend force was necessary; (c) utilize the appropriate levels of force within the use of force continuum, rather than immediately resorting to dangerous and violent force; and (d) utilize authorized and effective control maneuvers without injuring Plaintiff, rather than resorting to

the dangerous, violent, and unauthorized maneuvers described above that caused Plaintiff's various injuries.

130. Defendants' MCSO and Penzone's negligent training and supervision, and Defendants' policy of condoning and ratifying excessive and unreasonable uses of force like those described herein, created a culture within MCSO that tolerates such unreasonable uses of force and thus increased the risk that Defendant Harris would use excessive and unreasonable force on Plaintiff, and indeed caused such excessive force to be used.

131. Defendants' MCSO and Penzone's negligent training and supervision of Defendant Harris caused Plaintiff's damages as described in this Complaint.

## PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and grant:

A. Compensatory and consequential damages, including past and future damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B. Economic losses on all claims allowed by law;

C. Special damages in an amount to be determined at trial;

D. Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

E. Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

F. Pre and post-judgment interest at the lawful rate; and,

/ / /

G. Any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

**Plaintiff requests a trial by jury.**

RESPECTFULLY SUBMITTED October 30, 2018.

                                          DAWSON & ROSENTHAL

                                          */s/ Sander R. Dawson*

                                          Steven C. Dawson
                                          Anita Rosenthal
                                          Sander Dawson

                                          *Attorneys for Plaintiff*